Alright fourth and finally today we've got some consolidated cases City of North Miami at all versus the FAA 2014-656, 2014-662, 2014-674, 2014-677, 2014-689 and it looks like I've got Mr. Tabor and Fleming splitting top side. Ms. Jaffe for the Appellees. Tell me briefly just how we're going to structure this. You're going to speak for three, Ms. Jaffe is going to go 15, then you're going to go three, then you're going to go two? Got it. Alright, let's do it. Good morning, your honors. May it please the court. I am Stephen Tabor, counsel for the petitioners. The Supreme Court in Burbank v. Lockheed Terminal said the Federal Aviation Act requires a delicate balance between safety and efficiency and the protection of people on the ground. Because of the decision under arbitrary and capricious and not in accordance with law. First, FAA violated NEPA by failing to take into consideration the cumulative effects of its past actions. That is, the FAA failed to analyze the environmental degradation that might occur if the minor effects of multiple actions accumulate over time. FAA first sent aircraft over Biscayne Bay in 2006. No noise analysis was done since FAA used a categorical exclusion. However, due to limitations on the number of aircraft equipped to handle the new GPS based navigation, not many aircraft used those flight procedures. Over the years, FAA tweaked the flight procedures as the number of flights using the routes over Biscayne Bay increased, turning up the heat little by little. Finally, when FAA undertook the South Florida Metroplex, it set the baseline as 2018, 12 years after the first aircraft headed over Biscayne Bay. Can I ask you just a quick question about this baseline issue? I mean, aren't you in effect challenging the FAA's failure to account for noise in 2006 and 2015? I mean, if someone had brought the FAA back in 2006 and 2015 and won, at that point, wouldn't the FAA be justified in starting the clock, the baseline clock of 2018? And if the answer to that question is yes, then I'm not really sure why this isn't like a throwback challenge to 2006 and 15. This is not a challenge to the issues of 2016, of what happened, or excuse me, 2006. This has to do with cumulative effects where the past actions of the FAA were unanalyzed, and the FAA may have been correct in using the categorical exclusion, or whatever, for whatever reason, the FAA did not do any noise analysis, and now it has to look at how those past actions all accumulated over time and created the situation as we have now. For example, your honor. Well, so I just want to make sure I understand this. So if someone had brought a challenge, the FAA's failure to do noise analysis in 2006 and won, what's the baseline at that point? In 2006, it would have been 2006, because... And so just to follow up, if someone had brought a challenge to the FAA's failure to account for noise in 2015 and won, what would the baseline be then? I would say the baseline would be the 2006. Well, excuse me, the baseline would have been the prior noise analysis. If they had won, you know there would have been some noise analysis of the flight procedures that were instituted in 2006. And so whatever the results of that noise analysis would be the baseline for the next procedure. So even if there's a challenge in 15, and a court says, FAA, you failed to do the proper noise analysis and do it, and the FAA does it, then in the next challenge, we still look back to 2006? Yeah, well, in terms of the cumulative effects, yes. Because you recognize that the FAA looks at noise in terms of change between change in the amount of noise. So each time it compares the amount of noise with the amount of noise that will be created by the project. So while this project may not increase, have a significant impact, if you have, you know, a five decibel increase in 2006, a five decibel increase in 2007, and all the way up, if you look back over time, there may not have been a significant impact at each one of those each one of those years. But when you look back over time, there has been a significant impact by if you look at 2006, when the flight procedures were first started going over Biscayne Bay, and the period now for the Metroplex flight procedures. Well, this project, as I understand it, basically, they're narrowing and shortening flight paths for the most part above 3,000 feet. And I mean, they've concluded that has a negligible impact on on sound. Isn't that what we really ought to be looking at? And are you, in effect, conceding that point by going to this cumulative effect argument? Well, no, Your Honor. They do affect the arrival and departure procedures, which are necessarily not under 3,000 feet, or which are under 3,000 feet. They may, they have concluded in their noise analysis that there is no significant impact as they determined between the baseline of 2018 and the effect of the procedures as they are implemented. And the cumulative effects, but the FAA is required to look at the cumulative effect of past actions and aggregate all of those past actions to determine whether there's been any significant impact of the aggregate of their past actions. And because their past actions, there was no noise analysis, if you look at the accumulation over the years, there may have been a significant impact. We don't know. And they've determined that there was a less than significant impact of that period of time from 2018 to 2021. But it has to be a broader view in order for cumulative impacts. That's all the time I have. Okay. Very well. Mr. Fleming, let's hear from you for three minutes. Technical difficulties here. Here's the court. My name is Joseph Z. Fleming of Joseph Z. Fleming PA, Miami Beach. I represent Maureen Horowitz, who uses the bay and has the overflights over her home, who, as the record shows, was involved in the objection to a Corps of Engineers application under the Clean Water Act that got vetoed as a result of her work and the work of Florida Audubon Society under a 404C veto because it was invading the bay, which is a park that's here. I represent Friends of Biscayne Bay, which used the bay, which is a park, as shown by the record, under national, state, and county aquatic preservation, including the critical area of state concern, William Sadowski area on Virginia Key, placed there by the FAA because there were no people there. There was just a plant, even though that is a critical area of state concern. As to the remarks about the FAA, the environmental assessment essentially is a combination of fiction, similar to Joseph Heller's Catch-22 and Kurt Vonnegut's Slaughterhouse-5. Catch-22, because when they are told that they have these problems, they ignore them. Under 4C, they have to go and meet with the cities that are all objecting because they're in the bay, in the park, and they're getting noise. They have to go to the cities because, as they've indicated through their reference to a Miami Herald article, Miami Beach mayor said he thought these flights should be moved up the bay, away from residences and tourists. Not that Miami Beach is known for being quiet, but they were moved then over the Sadowski Park and all the way up to the end, Biscayne Bay, in an area that is very crowded, which requires not myopic views of the FAA, but expansive because now they're flying over black, poor neighborhoods such as North Miami, where more than 50% of the people are minorities. The environmental assessment says that they contacted the Department of Interior, which confirmed that among the other areas that it was involved with, it was involved with protection of Biscayne Bay, the park. The Department of Interior said the ambient areas that we have in these parks is like no noise, and maybe 20 of your so-called model measurements could be used, but we don't want your model measurements. The Department of Interior said we want you to go out and examine what actually happens in these areas, and the FAA said no, we're not going to do that because even though we create more emissions, which they admit throughout their material over the bay, even though we create more emissions, if they're above 3,000 feet, they don't count because we say they disappear and they meet the state air requirements. Well, that's not an environmental impact analysis that complies with the NEPA or the 4F. You've got to, under NEPA, study everything, so you can't pretend you're ignoring your own federal agency, and they say, well, as far as historic preservation, there's no resources, but they left out Arch Creek, and Maureen Horowitz confirmed in her material that she's involved with Arch Creek. You can't hear noise and lectures there, and the noise interrupts the lectures. The FAA says, well, we went to the SHPO. Well, in the City of Phoenix case, the FAA said the same thing. They said they had categorical exclusions. They went to a SHPO, but the court said, yeah, but you didn't go to everybody, and in fact, everybody here would be all of these people who are appealing from the cities because they're in the Bay, and under 4F, you would have to then sit down and meet with them, not eliminate their noise and say that you're, as a result, gonna solve the noise problem. So they have standards which are Procrustean pretenses of principles that they apply for categorical exclusions that are not allowed under the City of Phoenix case, and it's a really good question about the time. That's where Billy Pilgrim, excuse me, Your Honor. No, I think we've, uh, we are about a minute and 45 seconds over, so you've got some time on rebuttal. We'll give you some time on rebuttal. Let me just ask one quick question if I can. Um, to the extent that the FAA did not consult, for example, with the Florida Department of Environmental Protection, um, one of the agencies affected, um, you say that's a violation of 4F of the Department of Transportation Act. What's the remedy? If that's all she wrote, if that was the beginning, middle, and end of the violations by the FAA, what is the appropriate remedy for this Court to do? I say the remedy is basically to eliminate the ongoing flying, move it over the area that it was over of Miami Beach, where I live, away from the Bay, which is to be protected as a park, away from the Sadowski area, which is to be protected, and in addition, you have to consult with the people at the Historic Preservation Agencies, uh, such as those that involve Arch Creek, who have said this is destructive. You have to consult with the Florida Department of Environmental Regulation, and 4F says you've got to talk to these local people. Right. So, beyond talking on remand, your answer is you'd have to vacate. The answer is, I'm sorry, I said it wrong. Your answer is the entire thing has to be vacated in the meantime. Okay. Thank you. Very good. Uh, Ms. Jaffe, let's hear from you for 15 minutes. Okay. May it please the Court. Rebecca Jaffe, appearing on behalf of the FAA. Okay. I'd like to first touch on a couple of specific points raised in the opening. FAA did examine impacts on Arch Creek Park, um, and Arch Creek addition. The Court can see that at AR 19, at PDF 419, and PDF page 290. Uh, second, the FAA did consult with the Florida Department of Environmental Protection, and the Court can see that at AR 11, which is the Table of Community Engagement and Outreach document, at pages A-7 and A-77. FAA also consulted with all of the mayors in, um, all of the municipalities in South Central Florida. The Court can see that, for example, at AR 11, at pages A-12 to A-15. This case is very much unlike the City of Phoenix case, where, and this is a quote from City of Phoenix, the FAA never conveyed the proposed route changes to senior officials in the city's aviation department, local officials, or elected city officials. Uh, and FAA did not do notice and comment, and the Court can see that at City of Phoenix, page, um, 869 F3D 963, at 966 and 971, where there was no outreach and no notice and comment. I'd like to, uh, zero in on the kind of notice. I understand that the FAA sent notice to all of the local government petitioners here, and followed general note, notice, and comment procedures, and you held 12 public workshops. Um, did you consult specifically, for example, with the Florida Department of Environmental Protection on this? Yes, our position is that we did by reaching out to them and sending the letters and holding, actually, 19 public workshops, plus additional stakeholder briefings. That is to say, the general notice and comment is how you complied with 4F. I'm asking is, beyond that, did you specifically go to contact the Florida Department of Environmental Protection to seek their input and counsel, for example, on the noise levels? Yes, Your Honor. FAA specifically sent letters to the Director of the Florida Department of Environmental Protection and the Secretary of the Florida Department of Environmental Protection, and the Court can see that at page, at AR 11, pages A-7 and A-77. Thank you. In the FAA Modernization and Reform Act of 2012, Congress directed FAA to implement satellite-based flight paths, also called procedures, to improve safety and efficiency in the airspace. In accordance with that mandate, and after years of analysis and design, FAA modified flight procedures at 21 airports in the South Central Florida airspace. That is the agency action at issue here. That action did not increase or create flight traffic. FAA was simply modifying flight procedures and implementing satellite-based navigation to improve safety and efficiency, and FAA's action complied with the National Environmental Policy Act, Section 4F of the Department of Transportation Act, and the Clean Air Act. Are flight paths added, or are they just narrowed and shortened? I mean, were there new flight paths that didn't exist before, or were they moved? Explain that to me, if you would. Yes, Your Honor. There are, below 10,000 feet, FAA tried very, very hard to follow existing flight paths to minimize noise impacts. So it may be the same flight path, but instead of a flight path that uses land-based navigation aids like radar, it's a flight path that pilots input into the computer system, and it flies by satellites. So it's the same flight path, but it's satellite-based as opposed to land-based. There are some new procedures, but FAA worked very hard to make sure that the new procedures would be above 10,000 feet to avoid impacts on communities. By new procedures, what do you mean? I'm sorry, new flight paths. For example, a new holding pattern or a new way to transition from an arrival to, from being en route, sort of a cruising altitude to an arrival procedure. And I do want to flag to the point that, well, obviously all of these changes are below 3,000 feet. That's simply not the case. FAA's analysis is that the significant, there are no significant impacts, but any impacts that may cause a minuscule increase in emissions are all above 3,000 feet. Just as a, to take a step back, cruising altitude for an airplane is 30,000 feet or above. And a plane goes from being at 30,000 feet or above to beginning its arrival and approach procedures. And so there's a lot happening between 30,000 feet and ground level. FAA engaged in extensive analysis comparing the proposed action to a no action alternative. For example, in terms of its noise analysis, it established a baseline of existing noise, which as petitioners referenced was based on 1.7 million different flights between 2017 and 2018. And FAA modeled noise at hundreds of thousands of locations comparing existing noise to the proposed alternative, which is the new procedures or the modified procedures and the no action alternative where they wouldn't make any changes. And it found that at every single one of those points, the change in noise, if any, and at some of those points, there's a little less noise, at some it's exactly the same, and at some there's a little bit more, but at all, every single one of those points, the noise did not exceed FAA's significance threshold. FAA's air quality analysis also complied with the Clean Air Act and showed no significant impacts under NEPA. There is a minuscule increase in emissions from the project. It's less than half of 1%, but there won't be any impacts at ground level pollutant concentrations because the changes in procedures will be above 3,000 feet. So they won't impact emissions levels on the ground. And there's a lot of science- Disputed in the record that the emissions increases will only occur at 3,000 feet or do they dispute that? At or above 3,000 feet or do they dispute that? I think that they, I suppose I should let them characterize their argument, but my sense is that they're disputing that on the basis that the project involves arrival and departure procedures and their argument is those necessarily must go below 3,000 feet. And what we're saying is there are some changes that do increase emissions, but it's minuscule, but it's above 3,000 feet. And there's a lot of science showing that any change in emissions above that level simply doesn't affect ground level. And also, FAA has done a lot of studies between 3,000 feet and the ground, you really can't change flight paths that much because they're constrained by runway alignments, vertical obstructions, terrain, prevailing winds, things like that. So below 3,000 feet, the planes are basically flying the same tracks as before. FAA took into consideration to the greatest extent practicable designs that would reduce noise and emissions. It adjusted some procedure designs in response to public comments where it was possible to do so, but it could not accept some suggestions for safety reasons. FAA's analysis was reasonable and the court should uphold this important agency action, which improves safety and efficiency for Mr. Fleming made about the court should just vacate everything. That would be extremely problematic and disruptive and have safety consequences. We're talking about flight procedures that manage all of the air traffic in the South Central Florida airspace, which is an extraordinarily busy airspace. Before implementing these procedures, FAA trained over a thousand air a vacater order would be extraordinarily disruptive and unsafe. Could I ask you about this? I guess footnote two in your brief, it appeared to me there may be problems with standing for some of these cities, but it looks to me like you concede that the friends of Biscayne Bay do have standing and that one's enough. Is that basically your position? Yes, your honor. Whereas perhaps they have a constitutional claim, which would also present you don't make that concession on that standing argument as I understand it. Yes, your honor, my understanding is that friends of Biscayne Bay is not asserting the constitutional sleep claim and I don't believe that their declaration makes any factual assertions that would support it even if they were. So yes, we do assert that petitioners lack standing for the constitutional sleep claim because their declarations don't even mention sleep. All right. Thank you. Okay. Very well. Thank you very much. All right. Let's hear a rebuttal from Mr. Tabor. Three Brooks understanding of the flight procedures is in order. What happened was the satellite flight procedures were first instituted in 2006. This is when instead of going over the ocean, flights began to go over Biscayne Bay. And little by little as more aircraft became equipped with satellite navigation systems, more and more aircraft began using those procedures. And this last Metroplex initiative is the last step of that whole program that started in 2006 to send increasing numbers of aircraft over Biscayne Bay that first started in 2006. Also, I wanted to say that in the reauthorization act of 2012, also called vision 100, there was a provision in it that said that one of the goals of the next generation transportation program, air transportation program, was to wherever possible that the FAA consider arrival and departure procedures that reduce noise and emissions. And that was not done in this environmental assessment. That was not mentioned in the purpose and need. The citizens against Burlington versus Busey says that congressional intent is necessary as a part of purpose and need, and that was nowhere to be found in the environmental assessment, in the purpose and need of the environmental assessment. Mr. Tabor, I have a question. I'm not sure if it's more appropriately for you or for Mr. Fleming, and you can tell me. You argue, among other things, that there was a 4F violation, section 4F, of the Department of Transportation Act because the FAA failed to specifically consult with a variety of state and local agencies about potential noise impact on the 4F resources. I asked that question of Ms. Jaffe specifically whether they had indeed specifically counseled with the Department of Environmental Protection, the State Department of Environmental Protection, and she responded that the answer is yes, that they consulted, taking just this one example specifically, with the Department of Environmental Protection. They sent letters to the director. They sent letters directly to the Secretary of State, etc., and she cites the record AR11 at pages A7 and 77. Is that right or wrong? Was there a specific consultation or not, and did I ask that to the wrong person? That's more appropriately addressed to Mr. Fleming. I'm sorry. I didn't mean to take up your time with it. That's okay. Why don't you take a minute to make up. Yes, thank you. The court needs to understand that there's a difference between the noise analysis and cumulative effects. Noise analysis is the amount of noise that a project will create, and in that, the FAA looks at a baseline of existing noise and compares it to the amount of noise that will be noise over the cumulative effects of past actions. You look at an aggregate of all the past actions that created noise and compare that to see if there will be any significant impact on the environment at that point. With that, I'll conclude. Thank you, Your Honor. Very well. Thank you so much. All right. Mr. Fleming, two minutes, during which I would recommend you answer Judge Marcus' question. I'll start with answering the judge's question because it's very important. Unlike NEPA, which says you have to study and you have to do it in a very reasonable way or it's inadequate, which courts have held to be enough to stop a project, Section 4F doesn't allow for categorical assumptions or types of situations where you just stretch everything. It says that if there's going to be use of a park, which there is, you have to meet with these people and solve the problem. The FAA takes the position, we had notices, they could come to the meetings, they could come to the workshops, we wrote them letters. 4F is not an obligatory pen pal statute, it's a consultation and fixing statute. That's why the jet port in the middle of the Everglades was vetoed by the Department of Transportation. Let me ask you specifically about the Department of Environmental Protection. They said they wrote letters specifically to the director and the secretary. What else, in your view, did they have to do that they didn't do in order to comply with Section 4F? They had to sit down with the department and discuss the Florida outstanding orders, which were being violated. They had to sit down with each of the cities that was in the middle of the bay that's now protesting in the middle of these procedures and discuss the park. They had to admit there was a park there. They never admitted that they were under 4F involved in parks. They basically took the position that if they were, they could ignore that by doing three things. One was the slaughterhouse Billy Pilgrim unstuck in time. They said they'd always been doing this. And then in another section of the EAA, they said if they had done this before, then everybody had to challenge them before. But they also said if we had done this before, we would have violated NEPA. So they can't have it both ways. They also said that if it's for efficiency, then they don't have to consult. And they cite their own part 150, which is an interpretation they apply, and say it governs 4F and it governs NEPA. In other words, they wrote their own rules, catch 22. And they say if it's above a certain level, then it doesn't count because we meet the state air requirements, which have nothing to do with the models that they did and the models are inadequate. They didn't do any testing. If it's below 3,000, then they say it doesn't count because it's too low. They also have this immaculate inception erection kind of a situation like this and landing. They admit that the planes cause emissions. They admit that principally, generally, they're using 3,000 feet. But how do you get off a runway and turn over the bay at 3,000 feet? You obviously have to start at ground. And they pretend that if you're lower, it doesn't count because they have these kind of strange arguments about presumptions that they apply as opposed to real tests. So none of that works. The Phoenix case, rejected the type of pen pal appropriation that occurred here. In addition, that's the Phoenix case. I need you to wind up if you don't mind because we're over time. Well, then I just want to say that I appreciate your consideration. As Robert Richard Feynman said when he did the descent from the space challenger situation, you don't want to substitute PR, which is what you have in the E. A. For, uh, science because Mother Nature ultimately wins. Appreciate your time. Very well. Very much. Thank you. Uh, both sides. That case is submitted, and the court will stand and recess until tomorrow morning at nine.